UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MARJORIE CHERRY,

       Plaintiff,

   v.

DIGITAL EQUIPMENT CORP. LONG-
TERM DISABILITY PLAN, and
PRUDENTIAL INSURANCE CO. OF
AMERICA, a New Jersey
corporation,

       Defendants.

NO. CIV. S-05-2165 WBS JFM

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD

----oo0oo----

Plaintiff Marjorie Cherry brought this action alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132.  The matter came on regularly for trial on the administrative record, without a jury, on July 24, 2006.  See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999) (en banc).  Having considered the evidence in the

1

administrative record[1] and the arguments of counsel, the court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.   Findings of Fact[2]

1.    While she was employed by Digital Equipment Corp. in Palo Alto, California as a database systems analyst and programmer, plaintiff had symptoms of headache, dizziness, and weakness over the course of several months and was misdiagnosed with multiple sclerosis.  Plaintiff subsequently suffered a stroke.  To correct the resulting bleeding in her brain, plaintiff underwent surgery, during which an arteriovenous malformation (AVM) was excised from her cerebellum.  (CHERRY 00088 (Cherry Decl. ¶ 2).)

2.    Defendant Digital Equipment Corp. entered into Group Contract No. GD-19100, an insurance contract, with Prudential in 1987.  (CHERRY 00147.)

3.    Prudential's long term disability plan ("the plan") allows for disability insurance coverage, and provides the

---

[1]    The court has discretion to take additional evidence as needed.  Kearney, 175 F.3d at 1094.  However, the court has not been called upon to exercise that discretion because the parties have not submitted additional evidence beyond the administrative record.

[2]    The facts included herein come from exhibits 1-4, attached to the White declaration, which in turn come from two sources.  First, there is an incomplete version of the administrative record supplied by defendants, which will be cited as PRU 0001-0291.  Second, there are documents initially included in the administrative record but not included in defendants' disclosure, namely, Prudential's insurance policy and summary plan description, the documents plaintiff submitted in her administrative appeal of the plan decision and her subsequent correspondence with Prudential, and plaintiff's prior claim file, all of which will be cited as CHERRY 00001-00510.

following definition of disability:

> Total disability exists when Prudential
> determines that all of these conditions are met:
>
>> (1) Due to Sickness or accidental injury, both of
>> these are true:
>>> (a) You are not able to perform, for wage or
>>> profit, the material and substantial
>>> duties of your occupation.
>>> (b) After the Initial Duration of a period
>>> of Total Disability, you are not able to
>>> perform for wage or profit the material
>>> and substantial duties of any job for
>>> which you are reasonably fitted by your
>>> education, training or experience.
>> (2) You are not working at any job for wage or
>> profit.
>> (3) You are under the regular care of a Doctor.

(CHERRY 00136.)

4.   Prudential's Summary Plan Description provides that no legal action may be brought until sixty days after the submission of written proof of the loss for which a claim is made.  (CHERRY 00162.)

5.   Approximately five years after her surgery, plaintiff began to have increasingly severe headaches, vertigo, and confusion, and she left work in approximately 1991. Plaintiff was then treated by neurologists at the Stanford Stroke Center, who informed her that the AVM surgery had included the removal of a portion of her brain (more specifically, a portion of her cerebellum), and also had resulted in scarring in her brain that likely caused her intense pain and migraine-like symptoms.  (CHERRY 00088-89 (Cherry Decl. ¶¶ 2-3).)

6.   In 1992, plaintiff was evaluated by Dr. Bernard R. Wilcosky at the Sequoia Pain Treatment Center.  Her chief complaint at that time was of headaches lasting two to four hours in duration, occurring between two and four times each day.

Plaintiff informed Dr. Wilcosky that she could only consistently tolerate the pain of her headaches by resting in a dark room. She also stated that she was unable to focus or concentrate, and that this contributed to her inability to continue working. (CHERRY 00403 (May 28, 1992 Letter from Dr. Wilcosky to Dr. Gregory W. Albers).)

7.    Prudential contacted Dr. Albers, plaintiff's physician, at her request when Prudential was considering whether to award her disability benefits.  In a May 15, 1992 telephone interview, Dr. Albers stated that plaintiff was totally disabled because of chronic, intractable migraine-type headaches, and that MRI studies had shown that there was "empty space" and scarring in plaintiff's cerebellum as a result of her operation.  (CHERRY 00420-23.)

8.    Plaintiff was referred to the Sequoia Pain Treatment Center for evaluation "for the use of relaxation and other imagery techniques to help her control her severe and totally disabling headaches."  On May 28, 1992, David Levenson, M.D. evaluated plaintiff and outlined a program for her to follow involving relaxation and other pain relieving techniques. (CHERRY 00407.)

9.    On June 24, 1992, Prudential investigated plaintiff's hospital records in making a determination about her long term disability benefits.  In a request for her hospital records submitted by Prudential, the cause of plaintiff's disability was simply stated to be "Migraines".  (CHERRY 00415.)

10.    On June 25, 1992, Prudential completed its review of plaintiff's application for long term disability benefits and

4

1  approved her application, with plaintiff's benefits beginning on
2  March 19, 1992.  (CHERRY 00416 (Plaintiff Claim File).)

3       11.  On February 7, 1993, plaintiff was informed by
4  letter that she was to be awarded monthly disability benefits
5  from the Social Security Administration.  (CHERRY 00381-83.)

6       12.  In 1995, Prudential reviewed plaintiff's condition
7  once more, and determined that plaintiff was unable to function
8  because of chronic headache, dizziness, and depression.
9  Prudential also noted that plaintiff's "inability to concentrate
10 and intermittent gait disturbance" were permanent deficits.
11 Although defendant concluded that plaintiff was able to perform
12 light house chores about 20% of the time, when her "dizzy
13 exacerbations" subsided, defendant also noted that plaintiff was
14 unable to perform the duties of any job.  Therefore, plaintiff's
15 benefits were continued.  (CHERRY 00182.)

16      13.  In 1997, Prudential contacted plaintiff for
17 medical evidence that would support her claim of continued total
18 disability.  (CHERRY 00183-84.)

19      14.  Plaintiff provided Prudential with medical
20 information corroborating her claims of headaches, variants of
21 migraine, and depression.  (CHERRY 00185.)

22      15.  Plaintiff had an Independent Medical Evaluation in
23 December of 1997.  The neurologist with whom she consulted, Rajiv
24 S. Pathak, M.D., concluded that plaintiff was a poor historian
25 with poor memory, and that she remained disabled due to
26 headaches, depression, and to a lesser degree, due to residual
27 weakness in her left side.  (CHERRY 00188.)

28      16.  Plaintiff also consulted with a psychotherapist on

1  or about July 12, 1998, who stated that plaintiff is "functioning

2  below premorbid levels in all areas" and that she "sometimes

3  forgets trains of thought," has a slow-paced thought process, and

4  is easily confused.  (CHERRY 00192.)

5      17.  Prudential determined that plaintiff continued to

6  be disabled, but sought to determine if the condition was

7  irreversible or if plaintiff "would benefit from psych[ological]

8  and pain [management] treatment in an effort to improve [her] low

9  level of functioning at present."  (CHERRY 00188.)

10     18.  On March 17, 1998, Prudential had a representative

11 conduct a telephone interview with plaintiff.  The representative

12 noted that plaintiff had three major problems.  First, plaintiff

13 had "headaches occurring often which causes dizziness and vision

14 impairment."  Second, she had memory problems.  Third, plaintiff

15 experienced difficulty with becoming confused and unbalanced.

16 (CHERRY 00168-169.)

17     19.  On July 8, 1998, Ruth Braun, Ph.D., a clinical

18 psychologist who had treated plaintiff for three months, was

19 interviewed by an employee of Prudential.  Dr. Braun indicated

20 that plaintiff was limited by her neurological condition,

21 experienced difficulty with language, her sense of time, and her

22 memory.  She also noted that plaintiff had unpredictable onset of

23 headaches and dizziness.  Dr. Braun was doubtful that plaintiff

24 would be able to return to work.  (CHERRY 00171-72.)

25     20.  Neva Monigatti-Lake, M.D., an internist in Grass

26 Valley, evaluated plaintiff's shoulder pain in August 1999.  On

27 December 20, 1999, Dr. Lake filled out a questionnaire for

28 Prudential, in which she explained that plaintiff is unable to

1   work because of chronic headaches caused by her surgery, because

2   "[s]he is permanent and stationary."  (CHERRY 00262.)

3       21.  According to an incomplete claim note entered on

4   May 8, 2000, Prudential conducted another review of plaintiff's

5   medical information.  The note concludes with the statement that

6   plaintiff suffered from "cognitive defects that would prevent

7   [plaintiff] from performing any occupation."  (CHERRY 00197.)

8       22.  In October of 2001, another entry in plaintiff's

9   claim file indicates her prognosis for returning to work was poor

10  at that time.  This note indicated that a follow-up review of

11  plaintiff's condition was scheduled for September of 2004,

12  approximately three years after the date of the entry.  (CHERRY

13  00198.)

14      23.  On October 13, 2004, Prudential obtained

15  information off the internet that plaintiff was serving as a

16  judge at dog shows.  (CHERRY 00199 ("[r]eview of [the] internet

17  reveals that [plaintiff] is a judge for dog shows and is

18  scheduled to judge on 10/16/04, 11/21/04, and recently judged on

19  8/31/04, 9/18/04, and 10/2/04").)

20      24.  Prudential suspected that plaintiff may not be

21  completely disabled, and subsequently began sub rosa surveillance

22  of plaintiff over the course of five days, from November 21, 2004

23  through December 3, 2004. (CHERRY 00216-00225.)

24      25.  On the surveillance video, which is of

25  approximately one hour in duration and does not include recorded

26  sound, plaintiff was recorded as she stood, walked around, bent

27  over, and moved about without any discernable physical

28  limitation.  With the assistance of another person, she paced out

7

distances to place orange cones in a pattern that would create an obstacle course for dogs.  She followed behind dogs and their handlers, making notes on a hand-held clipboard.  The content of her notes was not captured on film.  Plaintiff appeared to judge two separate rounds, and talked to the participants after each round.  She then handed out prize ribbons to the participants.  After the judging was completed, plaintiff went to her car and drove off alone.  (Supplemental Decl. Of Geoffrey V. White (Apr. 6, 2005 Compact Disk of Surveillance of Plaintiff).)

26.  The report accompanying the surveillance video notes that plaintiff drove from Stockton, California to Green Valley, California, in about two hours.  After the dog show, continued surveillance led to no further observation of plaintiff and no other information from plaintiff's neighbors, except that they did not feel that plaintiff maintains any particular schedule.  (CHERRY 00216, 00221, 00224.)

27.  From December 2004 through June 2005, Dr. Lake (who had treated patient since August of 1998) had four visits with plaintiff.  Dr. Lake noted that plaintiff had trouble with her memory and that she had "migrainous" headaches approximately three to four times a week, of four to five hours in duration.  (CHERRY 00072-75.)

28.  Prudential called plaintiff on December 17, 2004 to obtain information about her health and how often she visited her physician.  The claim notes indicated that plaintiff said she only sees her family practitioner and that "things are never going to change".  (CHERRY 00176-77.)

29.  On January 21, 2005, Prudential requested that

their Medical Director, Albert Kowalski, M.D., review plaintiff's recent office visit notes and the surveillance video.  Dr. Kowalski included a brief, one paragraph note that plaintiff's office visits had poor documentation of her condition, and that although they did not document a good physical condition, they also did not support sufficient impairment.  Additionally, Dr. Kowalski was persuaded that the surveillance video revealed plaintiff's ability to engage in sedentary work, because he saw no evidence of significant cognitive impairment.  He also summarily discounted plaintiff's visit with Dr. Neva on 10/8/04 and Dr. Neva's conclusions that plaintiff had impaired cognition and organic brain syndrome as inconsistent with the level of activity he observed on the surveillance video.  Dr. Kowalski made no mention of plaintiff's migraines as disabling and did not explain whether they were consistent or inconsistent with the activity on the surveillance video. (CHERRY 00200.)

30.  On January 27, 2005, Prudential sent plaintiff a letter notifying her that her long term disability benefits under a group policy issued to Hewitt Associates[3] were to be terminated. In making its determination, Prudential relied on the fact that plaintiff was able to move freely, assist with setting up an obstacle course, give instructions, grade the performance of the dogs, present award ribbons, and drive for over a two hour period of time to conclude that her activity was "inconsistent with impaired cognition and/or memory loss."  Additionally, Prudential

---

[3]    The court notes that plaintiff's benefits were actually granted under a group policy issued to Digital Equipment Corporation.

noted that plaintiff was scheduled to judge at four other dog

shows, although she was not observed judging these shows.

Prudential also informed plaintiff that she had a right to appeal

the decision within 180 days of receipt of the letter and that

the appeal would be decided within 45 days of the receipt of the

appeal request.  (PRU 0285-87.)

    31.  On June 17, 2005, Michael M. Bronshvag, M.D., a

neurologist, examined plaintiff at her attorney's request and

found plaintiff to be "anxious and depressed with a poor memory

and difficulty concentrating."  He also noted that "[s]he

appeared to be cognitively impaired."  (CHERRY 00076-79.)

    32.  Plaintiff appealed defendants' decision to deny

her benefits on July 29, 2005. (CHERRY 0020-0022).

    33.  Sharon A. Stewart, a licensed clinical social

worker, saw plaintiff for nineteen sessions from February 3, 2005

through July 8, 2005.  She noted that plaintiff informed her that

she experiences severe headaches three to four days a week that

typically last five hours in duration.  Plaintiff also stated

that when she takes her prescribed medication to treat her

headaches, she becomes immobilized for twelve hours.  Ms. Stewart

also related that she had witnessed plaintiff suffer these

headaches, which had caused her to terminate sessions early and

occasionally to "blank out" for several minutes.  (CHERRY 00080.)

    34.  On August 17, 2005, Dr. Bronshvag further

clarified his report by summarizing that plaintiff had

psychological/cognitive difficulty, headache pain, a need for

substantive medications, and difficulty with her legs and her

left arm.  Dr. Bronshvag concluded that plaintiff's level of

disability was probably permanent, but noted that if the surveillance films or other data provided a "completely different picture" of plaintiff, his conclusion could be inaccurate. (CHERRY 00014-15.)

35.  Plaintiff states in her declaration of July 21, 2005, that she was an apprentice judge at a practice dog show in November 2004.  Her tasks were to help set up an obstacle course, make notes on a checklist of the tasks completed by the dogs, and subtract points for errors during the course.  When she arrived home, she had a severe migraine and remained home for several days.  She found the required tasks to be prohibitively difficult, and thereafter stopped attempting to learn to become a dog show judge.  (CHERRY 00088-91.)

36.  Plaintiff also declares that on her good days, she is able to do some embroidery, read books, use a computer for email, do simple cooking and cleaning, and pay her bills, but she needs assistance and reminders to accomplish these tasks.  She is not able to balance her checking account.  Approximately twice a week, plaintiff goes to a store called "Scraps," where she knows the owner and helps in greeting customers or straightening stock on the shelves.  She is unable to use the cash register and cannot go to the store when she has migraines.  She now can only drive places she has previously been, because of mental (but not physical) limitations.  Plaintiff has to steer with her right hand, because her left hand is weakened to the point where it only helps her to steady the wheel.  She began attending dog shows with her friend Laurie Rossi, who is her neighbor and who is employed as a kindergarten teacher.  Ms. Rossi was unable to

attend the November 2004 dog show, and because plaintiff had
previously been to the location of the dog show, she decided to
attend on her own.  Plaintiff said that she needed assistance in
setting up the obstacle course, even though a dog show judge is
meant to do it alone.  She forgot many things and had difficulty
concentrating.  She also mixed up the award ribbons for the
winners, and had to correct her mistake by going back to the
judge's table.  (CHERRY 00088-95.)

37.  Arnette McClure, the co-owner of a store named
Scraps, has known plaintiff for between five and six years.  She
declares that plaintiff comes into her store about twice a week
to keep company with Ms. McClure and to pursue her love of dogs.
Plaintiff is not paid for her time in the store.  Ms. McClure
notes that plaintiff is unable to operate the cash register and
only straightens the shelves and helps customers obtain various
items from the shelves.  Ms. McClure notes that plaintiff has
trouble concentrating and "blanks out" at times, and also that
she has frequent "bad days" during which she has migraines and
dizzy spells.  Plaintiff cannot stay in the store for the full
time during a migraine episode.  (CHERRY 00098-99.)

38.  Laurie Rossi has known plaintiff for more than
five years, and she is good friends with plaintiff.  Ms. Rossi
goes with plaintiff to Scraps, and she notes that plaintiff
becomes too flustered to use the cash register, cannot keep track
of what she is doing, and has severe migraines several times a
week, during which she generally stays in bed.  Ms. Rossi
estimates that she drives plaintiff approximately 80% of the time
that plaintiff travels any distance or even goes into town.  She

notes that when plaintiff drives, she becomes confused by traffic
and changes in weather conditions.  Ms. Rossi also typically
accompanies plaintiff when she goes grocery shopping, because
plaintiff becomes too distracted to remember to buy all of the
items on her grocery list.  Ms. Rossi tried to learn "rally
obedience" dog judging, which she states is less difficult than
regular obedience shows.  The judge is required to keep track of
time and mark points off of a checklist for any mistakes.
Plaintiff and Ms. Rossi went to several practice shows as
apprentice judges, but Ms. Rossi did not attend the show on
November 21, 2004.  Out of frustration with the mistakes she had
made, plaintiff told Ms. Rossi that she was going to quit trying
to learn to judge dog shows, and she did not work at any shows
after that.  (CHERRY 00100-102.)

39.  Prudential received plaintiff's appeal on July 29,
2005 and acknowledged receipt on August 10, 2005.  (CHERRY 00020,
00018.)  In the appeal letter, plaintiff explained that the video
depicted her acting as an apprentice as a practice dog show, and
that she made numerous mistakes at the show that convinced her
she could not become a dog show judge.  (CHERRY 00019.)

40.  On September 9, 2005, Prudential sent a letter to
plaintiff's counsel stating that they were continuing to review
her appeal, and they required an extension of time of 45 days to
allow for a medical review from an "external resource" who would
evaluate the information in her file.  (CHERRY 00012.)  Plaintiff
responded with a letter sent on September 13, 2005 expressing her
confusion about the need for further medical review and
requesting that Prudential send copies of information provided to

13

1  the medical reviewer, a copy of the reviewer's report, and the

2  reviewer's curriculum vitae.  (CHERRY 00010.)  A claim note in

3  plaintiff's file, dated October 10, 2005, indicates that a Dr.

4  Gizzi concluded that further examination of plaintiff was

5  necessary to evaluate her cognitive claims.  (PRU 0251.)

6  Prudential informed plaintiff in a letter dated October 10, 2005

7  that a further independent medical examination by "an external

8  practicing neurologist" was necessary, and that they were still

9  reviewing the appeal.  (CHERRY 00009.)  This letter was received

10 by plaintiff on October 17, 2005.  (Id.)  After some additional

11 correspondence with Prudential, plaintiff decided to file suit in

12 this court on October 27, 2005.  (CHERRY 00001-2.)

13      41.  There is no indication in the record that

14 Prudential provided plaintiff with information from the medical

15 reviewer or that the appeal was ever decided by Prudential.

16 II.  Conclusions of Law

17      A.   Exhaustion of Remedies

18          Initially, the court must determine whether plaintiff

19 has exhausted her administrative remedies, pursuant to the

20 "firmly established federal policy favoring exhaustion of

21 administrative remedies in ERISA cases."  Kennedy v. Empire Blue

22 Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993).  The

23 exhaustion requirement is not provided by ERISA itself; rather,

24 under the applicable case law "a claimant must avail himself or

25 herself of a plan's own internal review procedures before

26 bringing suit in federal court."  Diaz v. United Agric. Employee

27 Welfare Benefit Plan & Trust, 50 F.3d 1478, 1483 (9th Cir. 1995)

28 (citation omitted); see also Moniz v. G.M.C., No. 98-4913, 2000

1   WL 1375285, at *3 (N.D. Cal. Sept. 18, 2000) (concluding that

2   "plaintiffs' [sic] were required to exhaust their pension plan's

3   administrative remedies before bringing suit").

4          Defendants contend that plaintiff did not exhaust her

5   remedies because she failed to follow the correct appeals

6   procedures.  Plaintiff received a notice that her benefits were

7   to be terminated on January 27, 2005, and this notice gave her

8   180 days in which to file an appeal of the termination of her

9   benefits.  Although defendants argue that the plan provides for

10  three levels of appeal following a claim denial, defendant does

11  not cite to the administrative record for this assertion, nor is

12  there any indication in the administrative record that three

13  levels of appeal are required.  Prudential's Summary Plan

14  Description does provide that no legal action may be brought

15  until sixty days after the submission of written proof of the

16  loss is made.[4]  Prudential received plaintiff's appeal submitting

17  written proof of her disability on July 29, 2005.  Plaintiff then

18  filed suit ninety days after submitting her appeal, which is in

19  line with this plan requirement.

20         Defendants additionally argue that they were entitled

21  to have plaintiff submit to an independent medical examination

22  (IME), that they requested an extension of time for medical

23

24         [4]     The Summary Plan Description merely provides a set of
    "claim rules" that apply to disability benefits.  However, it is
25  not clear whether these rules govern the initial determination of
    a person's eligibility for disability benefits or instead govern
26  the appeals procedure for a person whose disability benefits have
    been terminated.  Even assuming that these rules do place limits
27  on the appeal of a termination of benefits, as discussed in the
    text, it appears that plaintiff abided by these rules and
28  exhausted her remedies.

evaluation on September 9, 2005, that they informed plaintiff of their intention to arrange for an IME by letter dated October 10, 2005, and that plaintiff improperly refused to submit to the examination and instead filed this suit a few weeks later. Defendants appear to argue, without support, that plaintiff simply had to wait until Prudential made its determination before she could file suit.  The court cannot create an exhaustion requirement out of whole cloth based on what Prudential chose to require of a particular plaintiff in a particular case.

Instead, the court must again look to the terms of the plan.  Prudential's plan states that "Prudential, at its own expense, has the right to examine the persons whose loss is the basis of the claim.  Prudential may do this when and as often as is <u>reasonable</u> while the claim is pending." (CHERRY 132 (emphasis added).)  However, defendants' request for an IME was not reasonable at the time it was made.  First, defendants had already denied plaintiff's benefits before deciding there was a need for an IME.  Thus, if an IME was genuinely necessary, this calls into question whether there was sufficient support for Prudential's initial decision to deny benefits.  Further, as discussed in greater detail below, plaintiff's medical history demonstrated that she had a severe medical condition and an "empty space" in her brain, and there was no evidence that her condition had improved or would improve.  Therefore, the need for an IME was not clear for this additional reason.

Furthermore, although plaintiff did not submit to an IME, Prudential delayed meeting its obligations, and plaintiff did not fail to meet the deadlines provided in the plan.

16

Plaintiff appealed the denial of disability benefits on July 29, 2005.  Forty-two days later, on September 9, 2005, Prudential sent a letter to plaintiff seeking an extension of time of forty-five days to allow for an IME.  Thirty-one days later after requesting an extension, on October 10, 2005, Prudential informed plaintiff that further examination was required.  Plaintiff filed this suit seventeen days after she received the notice that Prudential wanted to conduct an IME, forty-eight days after Prudential requested a forty-five day extension for "external medical evaluation", and ninety days after plaintiff commenced the appeal.  Thus, when plaintiff filed suit on October 27, 2005, she had given Prudential the extension they requested and met the other deadlines outlined in the plan.

        "Although plan administrators may believe that they have articulated good reasons for their requests for more records or additional diagnostic tests, from the claimant's perspective these requests are often indistinguishable from pointless stalling."  Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 636 (10th Cir. 2003).  The court in Gilbertson additionally noted that "the costs of delay are generally much higher for claimants, who may need disability benefits to buy their daily bread, than for plans and administrators."  Id. (citing Booton v. Lockheed Medical Benefits Plan, 110 F.3d 1461, 1463 n.6 (9th Cir. 1997) (expressing concern that administrator had "little incentive to come to grips with [beneficiaries'] claims")).  Because Prudential unreasonably delayed in addressing plaintiff's claim, and plaintiff abided by the deadlines laid out in the plan, the court concludes that plaintiff has exhausted her remedies.

1          B.    <u>Terms of ERISA Plan</u>

2          Next, the court must interpret the terms of the plan

3    regarding plaintiff's eligibility for disability benefits.   In

4    doing so, a court should  "look first to the terms of the plan

5    itself."  <u>Nelson v. EG & G Energy Measurements Group, Inc.</u>, 37

6    F.3d 1384, 1389 (9th Cir. 1994).  Courts should then interpret

7    plan terms "in an ordinary and popular sense as would a [person]

8    of average intelligence and experience."  <u>Allstate Ins. Co. v.</u>

9    <u>Ellison</u>, 757 F.2d 1042, 1044 (9th Cir. 1985).

10          The dispute here, under the applicable plan language,

11   is whether plaintiff is totally disabled by virtue of being

12   unable "to perform for wage or profit the material and

13   substantial duties of any job for which [she is] reasonably

14   fitted by [her] education, training or experience."  Other courts

15   have noted that the ability to do sedentary work for short

16   periods of time does not establish the ability to perform full-

17   time, consistent work.  <u>See, e.g.</u>, <u>Wible v. Aetna Life Ins. Co.</u>,

18   375 F. Supp. 2d 956, 969-70 (C.D. Cal. 2005) (noting that the

19   plaintiff's ability to perform short periods of sedentary work

20   that does not require use of cognitive facilities was

21   insufficient to show the plaintiff was not disabled "from working

22   at any reasonable occupation for which [she] may be fitted by

23   training, education, or experience" with reasonable continuity

24   (alteration in original)); <u>Bruce v. NY Life Ins. Co.</u>, No.

25   00-1516, 2003 U.S. Dist. LEXIS 7225, at *20-23 (N.D. Cal. Apr.

26   28, 2003) (noting that the ordinary interpretation of the term

27   "occupation," unless modified by "part-time," contemplates

28   full-time work, and concluding that a doctor's opinion that the

18

1  plaintiff could "perform limited part-time work out of her home

2  does not support a finding that plaintiff can perform 'another

3  occupation' within the meaning of the subject policy").

4  ///

5              C.    Determination of Disability

6              Plaintiff has a long medical history, stemming from a

7  stroke and a surgery that left her with scarring and an empty

8  space in her brain.  Plaintiff clearly has some ability to

9  perform small tasks of daily life, and is relatively unimpaired

10 physically.  However, her medical history indicates that she

11 suffers from chronic, debilitating migraines a few times each

12 week.  Several physicians who have treated plaintiff have

13 indicated that her disability includes headaches, dizziness,

14 weakness on her left side, confusion, and depression.  None of

15 the physicians who treated plaintiff were able to find a

16 successful treatment or cure for plaintiff's chronic migraines.

17 Several physicians, at various times, indicated that they could

18 not foresee plaintiff regaining her ability to return to work.

19 Significantly, although plaintiff's confusion, distractability,

20 weakness on her left side, and depression clearly contribute to

21 her disability, when an agent of Prudential filled out a form to

22 obtain plaintiff's medical records, Prudential described

23 plaintiff's disability with just one word: Migraines.

24             Additionally, defendant concedes that "[p]laintiff

25 clearly has had a long history of subjective complaints and

26 medical treatment treatment [sic] following her 1985 stroke."

27 (Def.'s Cross-Mot. for Summ. J. 8.)  After determining that

28 plaintiff was totally disabled in 1992, and revisiting and

                                19

reaffirming the status of plaintiff's disability based upon her
medical condition in 1995, 1997, 1998, 1999, and 2001, defendant
decided in 2004 that plaintiff was no longer disabled and could
work for profit or wages.  This decision to deny plaintiff's
disability benefits rested on the opinion of one physician, Dr.
Kowalski, who did not conduct a physical examination of plaintiff
and relied solely on her medical records and a few days of <u>sub</u>
<u>rosa</u> surveillance.  Based largely upon the activity he observed
in the surveillance video, he opined in a one-paragraph note that
plaintiff's activities were not consistent with total disability.

  Defendants' video surveillance is insufficient evidence
to disprove the copious evidence from physicians who have
examined plaintiff at various times and found her to be
permanently disabled.  First, defendant's evidence does not
disprove the fact that plaintiff has migraines.  Plaintiff
submits that she periodically has "good days," during which she
is able to function reasonably well.  This is consistent with the
surveillance video as well as the medical evidence in the record;
plaintiff's physicians note that plaintiff has migraines some of
the time, but not constantly.

  Second, the tasks involved in setting up a circle for
an informal dog show and judging dogs do not appear to be
particularly onerous or intellectually challenging in a way that
would raise doubts about plaintiff's disability.  The
surveillance video shows plaintiff attending a dog show, judging
two rounds, and driving herself home.  Plaintiff states that she
was not able to manage the small difficulty involved in being a
dog show judge, and that she had a migraine that began when she

1   arrived home.  Plaintiff further submits supporting evidence to

2   that effect in the form of a declaration from her friend, a

3   kindergarten teacher, with whom she interacted after the dog

4   show.  For the next two days, plaintiff also states that she had

5   a migraine and did not leave the house.  The surveillance report

6   appears to confirm that plaintiff remained in her home, and

7   defendants have not presented any evidence to disprove

8   plaintiff's explanation of the events depicted in the

9   surveillance video.

10          There is also relatively recent evidence indicating

11  that plaintiff's medical condition has not changed.  Plaintiff

12  submitted evidence from 2005 in her appeal, including her own

13  declaration and declarations from Laurie Rossi and Arnette

14  McClure, all of which support the fact that plaintiff's

15  migraines, confusion, and dizziness continue to have an impact on

16  her in the small tasks of daily life and would prevent her from

17  holding a job.  Plaintiff additionally submitted evidence from

18  physicians supporting the fact that she continues to suffer from

19  headaches and confusion as a result of the empty space and

20  scarring in her brain.

21          The weight of the evidence clearly shows that plaintiff

22  had a persistent and total disability that did not lend itself to

23  treatment.  Defendants' surveillance video and the report of Dr.

24  Kowalski do not refute the most significant part of plaintiff's

25  disability: her chronic, debilitating headaches.  Therefore, the

26  court finds that plaintiff is totally disabled under the plan

27  definition, and is entitled to receive long-term disability

28  benefits.  Along with awarding judgment to plaintiff, the court

1  restores the long-term disability benefits that have been

2  withheld to the date of judgment.[5]

3          D.   Prejudgment Interest

4          Plaintiff contends that prejudgment interest at the

5  rate of ten percent per year should additionally be awarded,

6  pursuant to California Insurance Code § 10111.2.  "Whether to

7  award prejudgment interest to an ERISA plaintiff is 'a question

8  of fairness, lying within the court's sound discretion, to be

9  answered by balancing the equities.'  Among the factors to be

10 considered . . . is the presence or absence of 'bad faith or ill

11 will.'"  Landwehr v. DuPree, 72 F.3d 726, 739 (9th Cir. 1995).

12 The Supreme Court has explained that, in deciding whether to

13 award prejudgment interest,

14             [A] district court will consider a number of
              factors, including whether prejudgment
15             interest is necessary to compensate the
              plaintiff fully for his injuries, the degree
16             of personal wrongdoing on the part of the
              defendant, the availability of alternative
17             investment opportunities to the plaintiff,
              whether the plaintiff delayed in bringing or
18             prosecuting the action, and other fundamental

19

20      [5]   Plaintiff notes that prevailing plaintiffs in ERISA
   actions are entitled to reasonable attorneys' fees, absent a
21 showing by defendants that such an award would be unjust.  See
   Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir.
22 1984) (citing 29 U.S.C. § 1132(g)(1)); Canseco Constr. Laborers
   Pension Trust, 93 F.3d 600, 609-10 (9th Cir. 1996).  However,
23 plaintiff has not properly noticed a motion for attorneys' fees
   pursuant to the Local Rules of the Eastern District.  See E.D.
24 Local Rule 54-293 (noting that motions for attorneys' fees must
   be filed within thirty days of an entry of judgment and are
25 governed by Rule 78-230); E.D. Local Rule 78-230 ("[A]ll motions
   shall be noticed on the motion calendar of the assigned Judge or
26 Magistrate Judge.  The moving party shall file with the Clerk a
   notice of motion, motion, accompanying briefs, affidavits, if
27 appropriate, and copies of all documentary evidence that the
   moving party intends to submit in support of the motion.").
28 Therefore, the court will address this issue when a motion is
   properly filed within thirty days of the entry of this order.

1        considerations of fairness.

2  Osterneck v. Ernst & Whinney, 489 U.S. 169, 176 (1989).

3        Stepping through the relevant factors, the court first

4  concludes that prejudgment interest is necessary to fully

5  compensate the plaintiff for her injuries.  Plaintiff has been

6  wrongfully denied her disability benefits for approximately a

7  year and a half.  If she simply received the amount of those

8  disability benefits without prejudgment interest, she would not

9  be compensated for the lateness of the payments.  Another

10 relevant factor here is whether plaintiff delayed in bringing

11 suit.  It is hard to imagine that defendants would dispute that

12 plaintiff did not delay in bringing this action, particularly

13 when they argue that the opposite is true.  Additionally,

14 defendants have had the benefit of the interest on the money they

15 have withheld from plaintiff, which means that an award of

16 prejudgment interest would simply result in defendants'

17 disgorging this profit.  Plaintiff has incurred the loss, and the

18 equities weigh in favor of plaintiff receiving the interest that

19 defendants have so far reaped for themselves.

20       Whether the defendants acted in bad faith with regard

21 to plaintiff's claim is a more difficult question.  The court is

22 always reluctant to impute bad faith or ill will to any party;

23 all parties before the court are presumed to have acted in good

24 faith.  Nevertheless, after examining the exhaustive record

25 documenting defendants' review of plaintiff's claim, the court is

26 compelled to make a finding of bad faith here.  Prudential's

27 initial skepticism upon viewing plaintiff's actions in the

28 surveillance video was certainly understandable, and some action

                              23

in response was justified.  However, before terminating
plaintiff's benefits, Prudential had some obligation to
investigate the events they saw on a video that was recorded
without sound and provided without context.  They did not do so.

If Prudential had investigated further about the
circumstances of the dog show, they would have learned that
plaintiff was attempting to train to be a dog show judge, and
that her attempt to do so was unsuccessful.  She made several
mistakes on the day of their surveillance, including being unable
to perform tasks that were designed for one person without
assistance, becoming confused and distracted, and mixing up the
award ribbons she was supposed to hand to the contestants.
Moreover, even if plaintiff had demonstrated her ability to be a
dog show judge on occasion, this would not necessarily translate
to her ability to hold a regular job, given the frequency of her
incapacitating migraines.  Notably, nowhere in the record does
Prudential suggest what kind of job they believed plaintiff could
hold, except to say that she may be suited for a "sedentary
occupation".  It is unclear how plaintiff would be equipped to
perform an occupation based solely on its sedentary nature, given
her cognitive disabilities and debilitating migraines.

Additionally, the fact that Prudential persisted in not
paying benefits after they received plaintiff's explanation for
her actions in the video was unjustified.  Prudential maintained
their untenable position without sufficient evidence to do so;
significantly, they did not obtain an external medical evaluation
before terminating plaintiff's benefits.  Though Prudential did
not require an IME to make the decision to terminate her

24

benefits, they protest that plaintiff has not exhausted her

remedies because she did not agree to submit to an IME in the

course of her appeal.  Additionally, defendants vigorously

proclaim that an IME is so important that they are likely to

require one notwithstanding the court's ruling on this motion.

Now, after plaintiff has been deprived of her benefits for a year

and a half, they claim that an IME is necessary to make the

determination they have already made once and failed to reverse

upon review.  The court simply cannot find that these actions

were taken in good faith.

It must be emphasized that the court's finding of bad

faith on the part of the defendants which is merely one of the

factors the court considers.  It is important to note that an

award of prejudgment interest is not an attempt to punish the

defendants.  See Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d

974, 988 (9th Cir. 2001) ("Prejudgment interest is an element of

compensation, not a penalty.").  Rather, such an award is an

action taken by the court in its sound discretion to balance the

equities.  In balancing defendants' precipitous conduct against

the hardship faced by the wrongful denial of benefits to a person

with mental and physical disabilities for a year and a half, the

equities weigh in plaintiff's favor.  Therefore, plaintiff should

receive prejudgment interest.

Determining the rate of interest requires reference to

the federal rate defined in 28 U.S.C. § 1961.  See Grosz-Salomon

v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1164 (9th Cir. 2001)

(applying § 1961 to determine the appropriate rate of prejudgment

interest in an ERISA case); Murphy v. City of Elko, 976 F. Supp.

1359, 1364 (D. Nev. 1997) (noting in an ERISA case that "since
this is a case brought under federal law, however, we think the
proper rate is the federal rate" (citations omitted)); United
States v. Gordon, 393 F.3d 1044, 1058 n.12 (9th Cir. 2004)
("Under federal law[,] the rate of prejudgment interest is the
Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the
district court finds on substantial evidence that a different
prejudgment interest rate is appropriate." (citations omitted)).

Under 28 U.S.C. § 1961(a), the applicable interest rate
is "the average accepted auction price for the last auction of
fifty-two week United States Treasury bills settled immediately
prior to the date of judgment." 28 U.S.C. § 1961(a). This rate
may be found by referring to the Federal Reserve website, located
at: http://www.federalreserve.gov/RELEASES/h15/. However, with
regard to disability benefits, "the interest rate [is the rate]
that was in effect at the time payment was due to the plaintiff,
not the rate applicable as of the date of judgment." Fleming v.
Kemper Nat'l Servs., 373 F. Supp. 2d 1000, 1013 (N.D. Cal. 2005)
(citing Nelson v. EG&G Energy Measurements Group, 37 F.3d 1384,
1391-92 (9th Cir. 1994)). Thus, the interest rate should be
determined individually for each disability benefit payment that
plaintiff was denied, based on rate at the time that the benefit
payment became due.[6]

---

[6]     Defendants further argue that "as a general rule, a
right to plan benefits does not accrue prospectively," citing
Geiger v. Hartford Life Ins. Co., 348 F. Supp. 2d 1097, 1109-10,
1112 (E.D. Cal. 2004).  However, it is unclear what application
the quotation from Geiger has to this case.  The court in Geiger
was faced with a situation where there were two different welfare
benefit plans in effect at different times.  The court explained

III. <u>Conclusion</u>

IT IS THEREFORE ORDERED that:

(1) Judgment on the administrative record shall be entered IN FAVOR OF PLAINTIFF.  Plaintiff shall recover all benefits to which she was entitled under Prudential's long-term disability plan from the date such benefits were terminated on February 1, 2005 to the present.

(2) Plaintiff's request for prejudgment interest is GRANTED.  The rate of prejudgment interest shall be determined individually for each benefit payment according to the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date each of her withheld benefit payments became due, pursuant to 28 U.S.C. § 1961(a).

IT IS FURTHER ORDERED that defendants' motion for summary judgment, be, and the same hereby is, DENIED as moot.

///

///

///

---

that "the denial of ERISA benefits is judged under the standard of the plan in effect at the time the benefits are denied.  This ruling follows the generally accepted law that welfare benefits do not vest prospectively, but only when payments become due." <u>Id.</u> at 1112.  Thus, based on the fact that benefits vest at the time they are due, the court determined that the plan that was in effect at the time the benefit payments became due was the plan that governed.

Here, the court is awarding prejudgment interest to be set at the time the benefits became due.  Additionally, the court is reinstating plaintiff in the plan and awarding her past benefits that she has been denied, but is not awarding plaintiff her anticipated future benefits.  Other than these issues, there is no clear application of the <u>Geiger</u> court's reasoning--in particular, there is no analogous dispute here about whether to apply two different plans that were in effect at different times.

1          This case is hereby REMANDED to the plan administrator
2     for proceedings consistent with this Order.
3     DATED: August 10, 2006
4
5
6          WILLIAM B. SHUBB
7          UNITED STATES DISTRICT JUDGE

28